**FLORIDA POWER CORPORATION,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

No. 27404.

United States Court of Appeals,
Fifth Circuit.

May 1, 1970.

Richard W. Emory, Baltimore, Md., S. A. Brandimore, Gen. Counsel, Florida Power Corp., St. Petersburg, Fla., for petitioner.

George Spiegel, Washington, D. C., for intervenor.

Peter H. Schiff, Sol. Gen. Counsel, Watt N. Martin, Robert C. McDiarmid, Federal Power Commission, Washington, D. C., for respondent.

Before JOHN R. BROWN, Chief Judge, and TUTTLE and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

■ In this petition to review a Federal Power Commission order requiring the interconnection of the electrical transportation lines of the Florida Power Company with the distribution system of the City of Gainesville, Florida, primarily to secure emergency back-up power to overcome outages, two basic issues are presented. First, Florida Power contends that the Federal Power Act, 16 U.S. C.A. § 791a et seq., does not give the Commission jurisdiction to order a privately owned power company to interconnect its lines with those of a municipally owned system that both generates and distributes its own power. Second, the Commission's basic policy concerning the terms upon which an interconnection will be ordered is questioned.[1] Florida Power argues that the Commission's policy of looking to the proportionate burdens that each system places upon the interconnected system networks instead of the benefits received as a result of the particular interconnection is inconsistent with the statutory authority to compel the interconnection.[2]

We conclude that the Commission has jurisdiction to order this interconnection. We do not believe, however, that the Commission's order concerning the terms of this interconnection is consistent with the statute and thus we refuse enforcement of the order insofar as it fails to compensate Florida Power for making available large quantities of back-up power at the interconnection.

---

1. Florida Power asserts that it should be compensated financially for providing the interconnection. By a subsidiary point it also argues that the City should be restricted in the areas in which it directly competes with Florida Power by duplication of facilities. We believe that the question of duplication of facilities is not directly related to this case and hold that the Commission was proper in refusing to condition the ordered interconnection of facilities on the elimination of this duplication.

2. Section 202(b) of the Federal Power Act, which grants the Commission authority to order interconnection, provides:
"Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons: Provided, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers. The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them."
16 U.S.C.A. § 824a(b).

## I.

### A. The City of Gainesville System

The City of Gainesville owns an isolated electric generation, transmission, and distribution system that serves 17,212 customers in the City and the adjacent areas. This system is projected to have a capacity of 138.4 mw [3] of generation in 1970 with its largest unit rated at 50 mw. The only transmission facilities operated by this system are a 115 kv [4] loop around the City and a 115 kv line to establish connection with Florida Power. The projected maximum peak hour demand (peak load) of the City's system in 1970 will be 102 mw.

### B. Florida Power's System

In contrast to the small City of Gainesville system [5] Florida Power operates a major generation, transmission, and distribution system that serves 370,000 retail customers and supplies wholesale power to 12 municipal distribution systems and 9 REA cooperatives. It covers 20,600 square miles in West, Northwest, and Central Florida. During 1970 Florida Power will have 2114 mw of generation and projects a peak load of 1826 mw.

Florida Power's massive system operates through a backbone transmission network, and is connected with four major electrical systems in peninsular Florida (Tampa Electric Company, Florida Power & Light Company, Orlando Utilities Commission and Jacksonville Electric Authority). It is also connected with Georgia Power Company and Gulf Power Company.

### C. The Results of the Interconnection

Obtaining emergency reserves [6]—both instantly available and peak load installed capacity—in small isolated systems such as that operated by the City is a difficulty accentuated more by isolation than size. The only two solutions are the acquisition of additional generating capacity that will rarely be used and which is economically inefficient since a large portion of it must be kept in operation or "spinning" in order to provide the essential instantaneous reserve (see

---

3. A megawatt (mw) is a large unit of electric generating capacity. It is 1,000 kilowatts or 1,000,000 watts.

4. A kilovolt (kv) is a large unit of electrical voltage used to rate transmission lines. Depending upon the size of the conductor a 115 kv line has a capacity of approximately 125 mw.

5. The disparity in the sizes of the Gainesville and Florida Power systems and in the sizes of their electrical resources is striking and highly significant. These disparities in size are increasing each year as a result of the annual load growth on the Florida Power system being currently almost twice Gainesville's 1966 peak load and in excess of Gainesville's projected 1970 peak load of 102 mw. Gainesville's largest 50 mw generator is dwarfed by 8 generators on the Florida Power system and is about the equivalent of units that Florida Power uses only to meet peak load conditions and frequently places on cold shut-down.

6. Emergency backup service is providing the reserve of generation which a system must have to protect against inability to supply load in the event of a failure or outage of generation. Generally speaking, it is industry practice to have available a reserve of generating capacity at least equal to the capacity of a system's largest generator. To the extent emergency backup service is available from some other source, a system can reduce its installed reserve of generation. Generally speaking, it also is industry practice to protect against a failure or outage of a system's largest generator by operating at all times a reserve as generation (customarily referred to as spinning erserve) equal to the load being carried by the largest generator in operation. The operating reserve of generation, as distinguished from the installed reserve of generation, is called spinning reserve because it must be in operation and be instantaneously available. If the operating reserve of generation is not instantaneously available with a loss in frequency of less than one-half cycle per second—$\frac{1}{120}$th of a second—the system will suffer a frequency disturbance that can cascade, trip out other generating units, and shut down the entire system.

note 6, *supra*) or to end the system's isolation by connection with other systems that can provide the emergency reserve.

To acquire emergency reserve of 50 wm, the size of its largest generator, the City chose the latter solution and sought to achieve the desired interconnection through negotiation with Florida Power. When they were unable to come to terms, the City filed an "Application for Interconnection and Complaints Against Unlawful Actions"[7] with the Commission.

Pursuant to this application a hearing was held. The Presiding Examiner found that an interconnection was clearly in the public interest since the City would be relieved of the necessity of maintaining and adding to its present inordinately large and inefficient generating reserve. Under the terms of the recommended order Gainesville would have an additional reserve capacity equal to the size of its largest generator, would save approximately $300,000 per year[8] in investment and operating cost even after paying the cost of the interconnection,[9] and would have the reliability of a bulk power supply that it could have not previously achieved.

The Presiding Examiner found, however, that the benefits of the interconnection flowed in the direction of the City's system. Florida Power, because of the relatively small size of the City's generators, would receive no significant additional reliability.[10] Because of the automatic nature of the interconnect, however, Florida Power will sell some power to the City in nonemergency situations, but these periods will be rare because the City has already built up large quantities of excess capacity that can be used to meet high demand periods. The Presiding Examiner recommended that, even though no additional facilities would be needed and there would be no undue burden on the Florida Power system, Florida Power should be compensated.

He recommended that no set demand charge be imposed on the City. Instead, he recommended that "the total operating benefits in dollars received by each party by reason of the interconnection be computed based on the respective estimates of savings to each, and payment of 50 percent of the difference be made by the party receiving the greater benefit by reason thereof to the party less advantaged * * *."

The Commission agreed that the interconnection was in the public interest. It concluded, however, that no compensation should be paid. Its decision was based on a policy of responsibilities which it phrased this way:

"As a general proposition we note that whenever two electric systems with generating capacity undertake to interconnect and operate in parallel

7. The City's charges of unlawful activity relate to the direct competition between the City and Florida Power in rural Alachua County. See note 1, *supra*.

8. The Presiding Examiner found that the savings would be "in excess of $300,000." The Commission staff submitted a study showing Gainesville would realize investment and operating savings from reduction of its installed reserve of generation averaging about $231,000 a year for the period of 1970 through 1979. Florida Power witnesses estimated these savings at $520,000 a year.

9. The Commission and Presiding Examiner agreed that the City should bear the whole cost of building the physical facilities necessary for the interconnection. This

will cost between $1,500,000 and $3,000,000 depending on the length of the transmission lines the City chooses to use.

10. The Presiding Examiner concluded that Gainesville could contribute only 6 mw, 3 mw, and 2.5 mw to Florida Power's system reliability. It seems clear that these amounts are too insignificant to have meaning or value to Florida Power, which must have emergency power instantaneously available (spinning reserve) to withstand outages or more than 400 mw. Moreover, Florida Power's backbone transmission network has so many power sources more efficient and economical than Gainesville's small generators it is totally unrealistic to consider the City's system a significant power source.

it is necessary for them to consider the nature of their respective electrical resources and individual system utility responsibilities, both as a means of evaluating the particular services to be rendered between the connecting systems and in order to ensure that appropriate compensation is afforded, either through service exchanges or financial payments. Marked disparities between two (or more) systems in the reliance placed upon the network should be reflected in the terms and conditions of the interconnection arrangement through appropriate provisions. Each participant should bear its proportionate share of that responsibility. In our judgment, a prerequisite to viable and effective interconnected operations among all electric systems is an equitable sharing of the responsibilities of interconnected operation. Each participant should bear its proportionate share of that responsibility. In doing so, each interconnecting system will meet its utility responsibilities and there will be no economic penalties for being the last one on the interconnected network." [11]

Pursuant to that policy it concluded that payment for the energy actually used and the City's assumption of the cost of the interconnection adequately compensated Florida Power. As expected revenues from all types of services called for by the compulsory interconnect bear upon compensation, the order prescribed the rates, etc. for the three types of services set out in paragraph 7(d) (e) and (f), which are not to provide instantaneous emergency reserves. [12]

11. City of Gainesville v. Florida Power Corp., 1966, F.P.C.

12. The terms and conditions of the services are set out in paragraphs seven and eight of the order:

"(7) The terms and conditions of the sale and exchange of electric energy following the effective date of the interconnection, and thereafter, unless and until modified by rate schedule filing completed in accordance with Part 35 of the Commission's Regulations under the Federal Power Act or modified by Commission order, shall be as follows, subject to modification by written agreement of the parties and acceptance by the Commission of such modification:

(a) Installed Reserves: Gainesville shall own or provide generating capacity resources equal to or greater than 115 percent of Gainesville's estimated annual peak-hour demand. The estimated peak-hour demand for any year shall be that given for the calendar year in Schedule 19 of the latest FPC Form 12 Report filed by Gainesville with this Commission, unless otherwise agreed to in writing by the parties.

(b) Economy Energy: If the parties engage in economy energy transactions, payment therefor shall be at the rate per kilowatt hour of one-half the sum of the incremental cost of providing the energy from the seller's resources plus the incremental most that would have been incurred by providing the energy from the buyer's resources.

(c) Operating Reserves: Gainesville shall maintain spinning and ready reserves in accordance with procedures established by the Florida Operating Committee up to a limit of 15 percent of Gainesville's estimated annual peak-hour demand for ready reserves and up to a limit of 10 percent of that demand for spinning reserves.

(d) Inadvertent Energy Transfers: Inadvertent transfers of energy shall be returned by the receiving party in an amount equal to that received and at comparable times, or shall be paid for as specified in paragraph (7) (g) below.

(e) Emergency Electric Service: Emergency electric service provided for a period of less than 60 minutes shall be treated as Inadvertent Energy Transfer (see paragraph (7) (d) above). Such service, if provided beyond the end of a 60 minute period shall be treated as Scheduled Electric Service (see paragraph (7) (f) below).

(f) Scheduled Electric Service: To the extent of its ability to do so, each party shall provide power and energy to the other for scheduled maintenance of generating or other facilities. Payment shall be in accordance with paragraph (7) (g) below.

(g) Payments: Except for payments related to Economy Energy transactions, described under paragraph (7) (b) above, payments shall be as follows:

(1) Inadvertent energy, if not returned in kind, shall be paid for upon

## II.

### Jurisdiction

Florida Power makes a frontal assault upon the Commission's action by a challenge to the Commission's authority to act upon the petition of a generating municipal system. The argument is that Section 202(b) of the Federal Power Act, 16 U.S.C.A. § 824a(b) (see note 2, *supra*), only authorizes the Commission to compel a public utility to establish a physical connection with "one or more *persons* engaged in the transmission or sale of electric energy" (emphasis added). The argument then turns to section 3, the definitional section of the statute, 16 U.S.C.A. § 796,[13] and points out that "person" is defined as "an individual or a corporation" and then that section 3(3) defines "corporation" to expressly exclude municipalities. Florida Power also points out that Section 201(f), 16 U.S.C.A. § 824(f), specifically provides that no

"provision in this Part [II, which includes Section 202(b)] shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing * * * unless such provision makes specific reference thereto."

Despite the apparent cogency of the argument, this use of the definitional section of the statute as a limitation on the scope of the Commission's jurisdiction has previously been rejected. In United States v. Public Utilities Commission, 1952, 345 U.S. 295, 73 S.Ct. 706, 97 L.Ed. 1020, the Court held that the definitional section did not limit the Commission's authority over rate regulation.[14] In addition, in New England

30 days' notice given by the delivering party at the rate of 4 mills per kwh, or the seller's average fuel cost plus 10 percent of such cost, whichever is less at the point of interconnection.

(2) Scheduled Electric Service shall be paid for at the rate of $.05 per kw per day for each kw of actual or scheduled demand, whichever is greater, if paid for by Gainesville or whichever is smaller if paid for by Florida Power, plus 4 mills per kwh or the seller's average fuel cost plus 10 percent of such cost, whichever is less at the Archer Substation.

(8) Gainesville shall reimburse Florida Power for the annual costs associated with providing frequency regulation for its control area until such time as Gainesville installs tie-line bias control equipment in its own system and assumes responsibility for regulation of its own control areas. Florida Power is directed to submit to the Commission a proposed rate schedule covering this type of service. If the parties cannot agree on how to classify Florida Power's costs associated with the frequency regulation function or on a method of allocating such costs to Gainesville, the Commission shall make the determination of the annual payment due from Gainesville to Florida Power after receiving the views and supporting calculations of each party."

13. "The words defined in this section shall have the following meanings for purposes of this chapter, to wit:

(3) 'corporation' means any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, or a receiver or receivers, trustee or trustees of any of the foregoing. It shall not include municipalities as hereinafter defined;

(4) 'person' means an individual or a corporation

(7) 'municipality' means a city, county, irrigation district, drainage district, or other political subdivision or agency of a State competent under the laws thereof to carry on the business of developing, transmitting, utilizing, or distributing power * * *.
16 U.S.C.A. § 796.

14. The Court relied heavily upon the legislative history to demonstrate that the definitional sections were not controlling. The Court said that it did not "find any evidence of conscious coordination of §§ 3(3), (4) and 201(d) from the legislative history. True, they were simultaneously enacted, and, in fact, the interpolation of the word 'person' into § 201(d) occurred after the §§ 3(3) and 3(4) definitions were in existence in S 2796, 74th Cong., 1st Sess., as passed by the Senate and reported to the House, June 13, 1935. But this alteration came at the insistence of

Power Co. v. F.P.C., 1 Cir., 1965, 349 F.2d 258 the First Circuit held that the definitional sections did not limit the power of the Commission to order an interconnection between a public utility and a nongenerating municipality.

Florida Power also argues that, independent of the language of the statute, the legislative history shows that generating municipalities were not "persons" for purposes of Section 202(b). This argument is more viable than the one limited to the language of the statute since both the Supreme Court and the First Circuit specifically reserved the question of whether a "municipality which generates as well as distributes electricity is to be regarded as a 'person' under this section of the Act." New England Power Co. v. F.P.C., *supra*, 349 F.2d at 263. See also United States v. Public Utilities Commission, *supra*, 345 U.S. at 312–313, 73 S.Ct. at 716–717, 97 L.Ed. at 1036–1037. Moreover, Florida Power's position seems to draw support from the statements of the principal draftsmen of the Act, Federal Power Commissioner Clyde L. Seavey and Mr. Dozier A. DeVane,[15] Solicitor for the

Commission. And such statements may be powerful indicia of legislative intent and purpose. Zuber v. Allen, 1969, 396 U.S. 168, 181–183, 90 S.Ct. 314, 322–323, 24 L.Ed.2d 345, 354.[16]

On closer examination, however, it is apparent that the statements of Commissioner Seavey and Solicitor DeVane refer only to the Commission's power to order public utilities to act as transporters of—"wheel"[17]—low cost government power to a government customer at the expense of a privately owned company. See, e. g., Hearings Before the Committee on Interstate and Foreign Commerce, House of Representatives, on H.R. 5423, 74th Cong., 1st Sess. (1935), 394, 395, 397, 532, 546, 559, 564; Hearings Before the Committee on Interstate Commerce, Senate, on S. 1725, 74th Cong., 1st Sess. (1935), 257, 260, 271. And, although there are general statements by them that do not necessarily refer to "wheeling", see e. g., Senate Hearings, *supra* at 256, after close examination of the entire legislative history we can find no support for the conclusion that municipalities which generate their own power were to be treated differently from nongenerating munici-

---

the House. The Senate had provided for jurisdiction over sales occurring before or after interstate transmission, ibid., § 201 (f), and the House amendment, from which § 201(d) in its present form stemmed, covered sales during the transmission across state lines for the first time. So the House Report is, we think, significant in its redefinition of the section: 'A "wholesale" transaction is defined to mean the sale of electric energy for resale.' HR Rep.No.1318, 74th Cong, 1st Sess., p. 8. We conclude, therefore, that the Congress attached no significance of substance to the addition of the word 'person', and in fact did not intend it as a limitation on Commission jurisdiction. Indeed quite the contrary was sought by the House amendment of § 201(d)." 345 U.S. at 313, 73 S.Ct. at 716, 97 L.Ed. at 1036.

15. Later a United States District Judge.

16. In *Zuber* the Court said: "It would be perverse to assume that congressional

drafters, in eliminating ambiguity from the old act, were careless in listing their exceptions and selecting the illustrations from which the Committee Report from which their words would ultimately derive content." 396 U.S. 185, 90 S.Ct. at 325, 24 L.Ed.2d at 356. It should also be noted that the Supreme Court has previously used this testimony as an indication of legislative intent. In United States v. *Public Utilities Comm.*, *supra*, the Court said that there "is evidence * * * that the exclusion of producing municipalities from Commission jurisdiction was intended. For instance, DeVane, Solicitor of the Federal Power Commission at the time, testified as follows before the Senate Committee * * * [Excerpts from testimony]".

17. Wheeling is where A, which has excess generating capacity, seeks to transmit power to its customer C with whom it has no transmission connection, by using the transmission facilities of B, which has connections with both A and C.

palities concerning anything other than "wheeling".[18]

## III.

### The Terms of the Ordered Interconnection

■ Even though the Commission has jurisdiction to order this interconnection and even though the connection is "necessary or appropriate in the public interest" and the interconnection will not put an "undue burden * * * upon" the facilities of Florida Power or "impair its ability to render adequate service to its customers", the terms of the interconnection do not adequately satisfy the statutory requirements [19] because they do not provide Florida Power with the "reimbursement reasonably due" it. See 16 U.S.C.A. § 824a(b), (see note 2, *supra*). The interconnection will be of substantial benefit only to the City. Through the interconnection it receives essential emergency back-up, which is a service at all times instantaneously available, and which protects it against the outage of the largest of its generators. (See IC, *supra*). The benefits to Florida Power, however, are largely illusory.[20]

But, although there is no direct cost, Florida Power, really its customers, will bear a substantial burden. They must bear the allocated fixed cost represented by the added obligation imposed under the terms of the ordered interconnection. And this burden will be reflected in their cost-based rates. They are entitled to not have to carry the entire responsibility for providing an extremely valuable service.

The Commission's policy of proportionate utility responsibility really works only one way. The small system receives high benefits and, because of its size, no real obligations. The large system, however, receives no benefit but does incur real, substantial responsibilities. Such imaginary equity is not reasonable compensation.

Thus we deny enforcement of this order insofar as no provision for the reasonable compensation of Florida Power is made. The remainder of the order, however, is enforced, and compliance need not be delayed until the amount

---

18. From the legislative history cited by the Court in the *California Utilities* case, *supra*, it is apparent that when it specifically reserved the question of generating municipalities it was referring to the problem of "wheeling". See United States v. Public Utilities Commission, 345 U.S. at 312–313, 73 S.Ct. at 716–717, 97 L.Ed. at 1036–1037.

19. Although Florida Power makes a constitutional attack upon the Commission's action, we find it unnecessary to pass upon the questions raised.

20. The Commission indicated that it believed Florida Power would receive certain vague but substantial benefits as a result of the interconnection. These vague benefits were (i) possible deferral of future generating units because of co-ordinate planning of new facilities, (ii) the electrical operating benefits from the availability of the City's small power contribution, and (iii) the possibility of additional reliability from the City's contribution since Florida Power does not have generators in the immediate area (see note 10, *supra*.) But these benefits are unrealistic as well as vague, Florida Power's largest present unit has a 527 mw

capacity and a 875 mw unit is scheduled to be in operation in 1972. Obviously, any savings from coordinated planning with a system with the largest generator with only a 50 mw capacity are highly theoretical. And the Commission did not even suggest how the interconnection with the City was to contribute operational savings and reliability (reliability is the most unrealistic of all, see note 10, *supra*) to Florida Power.

The Commission's conclusions were, however, tentative as well as vague and unrealistic—"If we were to appraise Florida Power's request for an annual standby charge in terms of 'splitting of the benefits' test * * * "—and are not fact-findings protected by the umbrella of the substantial evidence test. As Mr. Justice Frankfurter said in SEC v. Chenery Corp., 1943, 318 U.S. 80, 93, 94, 63 S.Ct. 454, 461–462, 87 L.Ed. 626, 628, 636, "Its action must be measured by what the Commission did, not what it might have done". See Schaffer Transportation Co. v. United States, 1957, 355 U.S. 83, 78 S. Ct. 173, 2 L.Ed.2d 117; 2 K. Davis, Administrative Law Treatise §§ 16.05, 16.09 (1958).

Florida Power is to be paid is determined by the Commission and that determination reviewed.

But in sending this case back to the Commission for it to fix a formula for computing what would be reasonable compensation, we do not even whisper what that formula should be. On reconsideration the Commission may determine that the set demand charge requested by Florida Power is a reasonable formula. It may determine that the 50 per-cent-of-the-difference-in-benefits formula of the Presiding Examiner is more appropriate. It may decide to use parts of both, neither formula, or a completely different formula. This is for the Commission subject to later review.

Enforcement granted in part and denied in part.