GAINESVILLE UTILITIES DEPARTMENT ET AL.
*v.* FLORIDA POWER CORP.

No. 464.   Argued February 24, 1971—Decided May 24, 1971*

BRENNAN, J., delivered the opinion of the Court, in which all members joined except BLACKMUN, J., who took no part in the decision of the cases.

---

*Together with No. 469, *Federal Power Commission* v. *Florida Power Corp.*, also on certiorari to the same court.

*George Spiegel* argued the cause for petitioners in No. 464. With him on the briefs was *Melvin Richter. Gordon Gooch* argued the cause for petitioner in No. 469. With him on the brief were *Solicitor General Griswold, Samuel Huntington, Peter H. Schiff,* and *Leonard D. Eesley.*

*Richard W. Emory* argued the cause for respondent in both cases. With him on the brief were *Robert A. Shelton* and *S. A. Brandimore.*

*Northcutt Ely* filed a brief for the American Public Power Association as *amicus curiae* urging reversal.

*Thomas M. Debevoise* filed a brief for the American Electric Power Service Corp. et al. as *amici curiae* urging affirmance.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Under the Federal Power Act, an order of the Federal Power Commission that directs one electric utility "to establish physical connection of its transmission facilities with the facilities of" another utility "may prescribe the terms and conditions of the arrangement to be made . . . including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them." Federal Power Act § 202 (b), 49 Stat. 848, 16 U. S. C. § 824a (b).[1] The Commission order

---

[1] Section 202 (b) of the Federal Power Act, 49 Stat. 848, 16 U. S. C. § 824a (b), provides:

"(b) Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one

which directed respondent Florida Power Corp. to inter-
connect its electric system with that of petitioner Gaines-
ville Utilities Department did not contain a term or
condition sought by respondent requiring petitioner to
pay an annual standby charge of approximately $150,000
for the emergency or backup service provided by the
interconnection, 40 F. P. C. 1227 (1968); 41 F. P. C. 4
(1969). The Court of Appeals for the Fifth Circuit held
that, because of the omission of such a term or condition,
"the terms of the interconnection do not adequately
satisfy the statutory requirements because they do not
provide Florida Power with the 'reimbursement reason-
ably due' it. . . . Thus we deny enforcement of this
order insofar as no provision for the reasonable compen-
sation of Florida Power is made." 425 F. 2d 1196, 1203
(1970) (footnote omitted). We granted the petition for
certiorari of Gainesville Utilities Department in No. 464,
and of the Federal Power Commission in No. 469, 400
U. S. 877 (1970). We reverse the judgment of the Court
of Appeals insofar as it denied enforcement of the
Commission's order and remand for the entry of a new
judgment enforcing the Commission's order in its
entirety.

I

The demand upon an electric utility for electric power
fluctuates significantly from hour to hour, day to day,

---

or more other persons engaged in the transmission or sale of electric
energy, to sell energy to or exchange energy with such persons: *Pro-
vided,* That the Commission shall have no authority to compel the
enlargement of generating facilities for such purposes, nor to compel
such public utility to sell or exchange energy when to do so would
impair its ability to render adequate service to its customers. The
Commission may prescribe the terms and conditions of the arrange-
ment to be made between the persons affected by any such order,
including the apportionment of cost between them and the compen-
sation or reimbursement reasonably due to any of them."

and season to season. For this reason, generating facilities cannot be maintained on the basis of a constant demand. Rather, the utility's generating capability must be geared to the utility's peak load of demand, and also take into account the fact that generating equipment must occasionally be out of service for overhaul, or because of breakdowns. In consequence, the utility builds certain "reserves" of generating capacity in excess of peak load requirements into its system.[2] The practice of a utility that relies completely on its own generating resources (an "isolated" system in industry jargon) is to maintain equipment capable of producing its peak load requirements plus equipment that produces a "reserve" capacity equal to the capacity of its largest generating unit.

The major importance of an interconnection is that it

---

[2] The industry distinguishes between various types of "reserve" requirements. Since time is required to start up equipment that is not operating, a certain amount of equipment must be maintained in such a state that it can begin generating power immediately. The industry calls these instantaneous or "spinning" reserves, and they must be available to meet load variations and breakdowns of equipment as they occur. A utility must always maintain "spinning" reserves equal to the size of the largest generator currently in service producing power, in order to protect against a breakdown of that unit. As "spinning" reserves are called upon a utility must start up more equipment in order to maintain "spinning" reserves at an adequate level. These reserves are called "quick-start" or "ready" reserves and must be available on short notice—usually 10 minutes or less. Both spinning and quick-start reserves are collectively referred to as "operating" reserves, in contrast to "installed" reserves. Installed reserves refers to the remaining generating capacity of a utility, those generators that are not ready to be operated, or in operation. Accordingly, the expense associated with "reserve" requirements includes both capital expense—building the necessary "installed" reserve generating capacity—and operating expense—running the necessary "spinning" reserves and maintaining the readiness of "quick-start" reserves. In general, this opinion will not differentiate between the different reserve requirements.

reduces the need for the "isolated" utility to build and maintain "reserve" generating capacity.[3] An interconnection is simply a transmission line connecting two utilities. Electric power may move freely through the line up to the line's capacity. Ordinarily, however, the energy generated by each system is sufficient to supply the requirements of the system's customers and no substantial amount of power flows through the interconnection. It is only at the times when one of the connected utilities is unable for some reason to produce sufficient power to meet its customers' needs that the deficiency may be supplied by power that automatically flows through the in-

---

[3] The reason that interconnections lower reserve requirements is well illustrated by a hypothetical discussed in the Commission's brief, at 15–16.

"Assume that four electric systems operate in isolation and that each has an annual peak load of 500 mw served by several generating units the largest of which is 200 mw. At a minimum, each system would have to provide 700 mw of installed generating capacity (500 mw to cover the annual peak load plus 200 mw of installed reserves equal to the largest unit). If we assume further that each system operates its 200 mw unit near capacity throughout the year, spinning reserves equal to the output of that unit would constantly be required. If the four systems are to be interconnected pursuant to the Florida Operating Committee formula, total generating capacity need not exceed 2300 mw (total annual peak load—if all peaks occur during the same period—plus operating reserves of 300 mw, *i.e.*, 1½ times the largest generating unit). This 2300 mw capacity requirement would be met by requiring each system to maintain generating capacity equal to 115 percent of its annual peak load. Each system would thus have to maintain only 575 mw of generating capacity—125 mw less than would be required if operating in isolation. The interconnected system as a whole would require the constant maintenance of 200 mw of spinning reserves and 100 mw of quick-start reserves; each system's pro rata share of operating reserves would amount to only 75 mw. Thus, interconnection of the four systems would result in substantial capital savings by reducing installed generating capacity requirements and substantial operating savings by reducing operating reserve requirements." (Footnote omitted.)

terconnection from the other utility. To the extent that the utility may rely upon the interconnection to supply this deficiency, the utility is freed of the necessity of constructing and maintaining its own equipment for the purpose.

The Gainesville Utilities Department is a municipally owned and operated electric utility serving approximately 17,000 customers in a 22-square-mile area covering the city of Gainesville and adjacent portions of Alachua County, Florida. In 1965, Gainesville's "isolated" system had a total generating capability of 108.4 megawatts (mw) while its peak load was 51.1 mw. Gainesville's generating capacity in 1965 consisted of five steam electric generating units ranging from five to 50 mw. Thus Gainesville's generating capacity of 108.4 mw gave it a reserve capacity of 57.3 mw over its annual peak load of 51.1 mw—a reserve adequate to cover the shutdown of the system's largest generating unit of 50 mw. Gainesville's peak load was projected to be doubled to 102 mw by 1970. Its 1970 capacity, however, was projected to increase to only 138.4 mw through the addition in 1968 of two 15-mw gas-turbine generators. Thus an interconnection was necessary if Gainesville was to avoid having to make a still greater investment in generating equipment.

Florida Power Corporation operates a major electric generation, transmission, and distribution system serving 370,000 retail customers in a 20,600-square-mile system serving 32 counties in central and northwest Florida, including Alachua County. It also supplies power at wholesale to 12 municipal distribution systems and 9 REA cooperatives. In 1966, Florida Power had an aggregate generating capability of 1595 mw and experienced a peak load of 1232 mw. At the time of the hearing before the Commission, Florida Power was building a 525-mw generating unit to begin service in December 1969, and

anticipated a 1970 generating capability of 2114 mw and a 1970 peak load of 1826 mw. Thus the anticipated excess of capacity over peak load, 288 mw, is less than the size of its largest generating unit, 525 mw. However, the deficiency is provided for by interconnections which Florida Power has with four other Florida utilities. See n. 3, *supra*. All five of these utilities constitute the Florida Operating Committee, which, though informal in nature, serves as a medium through which the technical operations of its members are coordinated. As a result of the sharing of reserves made possible by the interconnection of the Committee's members, each utility is able to reduce the reserve generating capacity that would be required if it were electrically isolated. Specifically, each of the Florida Operating Committee members maintains generating capacity equal to 115% of its annual peak load.

For several years prior to 1965, Gainesville sought to negotiate an "interconnection" with Florida Power and with another member of the Florida Operating Committee, Florida Power & Light. When those efforts failed, Gainesville, in 1965, filed an application with the Commission seeking an order under § 202 (b) directing Florida Power to interconnect with Gainesville.[4]

## II

Section 202 (b) authorizes the Federal Power Commission to order a utility to interconnect with another, and to "prescribe the terms and conditions of the arrangement . . . ," if the Commission "finds such action

---

[4] At the same time, Gainesville also filed a complaint with the Commission charging Florida Power with unlawful discrimination under §§ 205 and 206 of the Federal Power Act, 16 U. S. C. §§ 824d, 824e, for failure to agree to an interconnection. The Commission dismissed this complaint as moot when the interconnection was ordered.

necessary or appropriate in the public interest," and "if the Commission finds that no undue burden will be placed upon such public utility thereby." The proviso to the section makes explicit that the Commission has no authority in ordering an interconnection "to compel the enlargement of generating facilities . . . [or] to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers." 16 U. S. C. § 824a (b).

Following extensive hearings, an examiner made findings that the proposed interconnection would be in the public interest and that it would not place an undue burden on Florida Power. The Commission affirmed the findings and further found that the interconnection would neither compel Florida Power to enlarge its generating facilities nor impair its ability to serve its customers. The Commission ordered the interconnection but on conditions (1) that Gainesville pay the entire $3 million cost of the interconnection, and (2) that Gainesville maintain generating capacity resources at least equal to 115% of its peak load—the requirement imposed by the Florida Operating Committee on all its members. The order also fixed the rates of compensation to be paid for actual energy transfers across the interconnection.

Respondent, Florida Power, does not challenge the Commission's order except in its omission of a term or condition that Gainesville pay approximately $150,000 annually as "compensation or reimbursement reasonably due" respondent for the backup service effected by the interconnection. Respondent contended that this charge, computed on the basis of Gainesville's largest generator, was justified because only Gainesville could gain from the interconnection since the reserve made available to respondent from Gainesville was too small to be of any realistic value to respondent's massive power system.

The Commission rejected the contention. It noted that respondent had not included a comparable charge in any of the contracts for interconnection voluntarily negotiated with members of the Florida Operating Committee. The Commission also emphasized that "the apportionment of cost" factor had been satisfied by requiring Gainesville to bear the full cost of making the interconnection. Primarily, however, the Commission rested its rejection upon two grounds. First, the Commission stated its view that, in applying the statutory provision, the appropriate analysis should focus not upon the respective gains to be realized by the parties from the interconnection but upon the sharing of responsibilities by the interconnected operations:

> "[T]hat sharing must be based upon, and follow the proportionate burdens each system places upon the interconnected system networks, not the benefits each expects to receive. Benefits received in any given situation may approximate these responsibilities or they may not. In the course of negotiation of voluntary pooling arrangements, benefits received may, on occasion, serve to offset burdens imposed in determining the appropriate charge for particular services rendered or facilities supplied. But where, as here, the cost of providing such services and facilities and the appropriate charges therefor have equitably been determined after a careful analysis and apportionment of the burdens and responsibilities of each party, there is no basis for any further consideration of relative benefits . . . ." 40 F. P. C., at 1237.

Second, the Commission found that even if the interconnection were evaluated on the basis of relative benefits, "this record shows that the proposed intertie will afford both parties opportunities to take advantage of

substantial and important benefits: electrical operating benefits, and corporate financial savings." *Id.*, at 1238. In its original opinion and in its opinion denying rehearing, the Commission specified the benefits that it found Florida Power would gain from the interconnection, as set out in the margin.[5] On the basis of these findings, the Commission concluded that no standby charge should

---

[5] "For the Company, the interconnection will add an additional energy source to its network in a geographic area where the Company has a substantial load (customer demands), but does not have generating plants of its own. Because of that, the expected benefit to Florida Power may be very substantial since the [Gainesville] governors have a faster rate of response setting than Florida Power's. Also of great importance to Florida Power is the improved system reliability which the Company will gain through the proposed intertie. That is shown in studies submitted by staff from engineering analyses of loss of load probabilities. They establish that the interconnection will have the effect of improving the reliability of Florida Power's system." 40 F. P. C., at 1238.

"[T]hroughout its application [for rehearing], the Corporation emphasizes the contention that Gainesville will not be able to render any service of significant value to Florida Power. Upon consideration of this argument we find that Florida Power has greatly underestimated Gainesville's capacity to be of service to the Corporation. Because of its electrical isolation, Gainesville has maintained a very large reserve capacity in relationship to its peak load. In 1965 its peak load was 51.1 mw, and its reserve capacity was 57.3 mw or 112.1 percent of peak demand. Although the purpose of this interconnection proceeding is to enable Gainesville to lessen its need for self-reliance, Gainesville's reserve capacity will continue to be large even after interconnection. The staff's witness has testified that during the ten year period 1970–1979, Gainesville's average minimum reserves at the time of Florida Power's annual peak hour demand will be 43 percent. According to staff's computations, Gainesville will be able to deliver, if there will be sufficient interconnection transmission facilities, anywhere from 60 mw to 100 mw to Florida Power during certain periods in January, April, and September 1970. This prediction that Gainesville will be able to furnish capacity of this magnitude to Florida Power plainly refutes Florida Power's assertion that the

be imposed on either party to the interconnection. Thus, under the terms of the Commission's final order, each party pays only for the power actually received from the other, and each party is obligated to deliver power only on an "as available" basis. 40 F. P. C., at 1236 n. 4, 1245.

The Court of Appeals' denial of enforcement of the Commission's order insofar as no provision was made "for the reasonable compensation of Florida Power"

---

interconnection will prove to be a one-way street with all the benefits flowing from the Corporation to the City. The Commission is satisfied that the interconnection will permit a reciprocal exchange of benefits to the mutual advantage of both systems.

.　　　　.　　　　.　　　　.

"Staff's studies of Gainesville's future reserve capacity also serve to refute Florida Power's allegation that there is 'no scintilla of evidence' to support the Commission's finding that Gainesville will become an additional interchange power source on Florida Power's network after the interconnection is consummated. Similarly, staff's studies rebut the Corporation's assertions regarding the insignificance of Gainesville's anticipated capacity contributions." 41 F. P. C., at 5–6 (opinion denying rehearing).

"Florida Power asserts that the Commission erred in finding that the interconnection will add an additional energy source in an area where Florida [Power] has no generating plant. The Corporation states that it now has three energy sources to supply its load in the Gainesville area and that it does not need a fourth. Florida Power's Form 12 for 1965 shows that the Corporation's Suwanee Plant is the closest generating source to its Gainesville load center. This plant is more than 75 transmission line miles away from this load center. The next closest plant is the Inglis Station which is more than 80 transmission line miles away. Florida Power's three energy sources are connected to the Gainesville load area by 69 kv transmission lines. According to staff, two of these lines serve other loads and could be vulnerable to outages. We agree with staff's position that the connection with Gainesville's generating resources would upgrade service reliability to the Corporation's customers in the Gainesville area." 41 F. P. C., at 7.

rested on the court's conclusion that the Commission's "proportionate burden" analysis was "largely illusory:"

> "The Commission's policy of proportionate utility responsibility really works only one way. The small system receives high benefits and, because of its size, no real obligations. The large system, however, receives no benefit but does incur real, substantial responsibilities. Such imaginary equity is not reasonable compensation." 425 F. 2d, at 1203.

The validity of this conclusion, however, depends upon whether the court correctly read the record as showing that Florida Power "receives no benefit" and that Gainesville incurs "no real obligations." [6] The Commission's findings are squarely contrary.

Although the Commission did argue that the benefits to be derived from the interconnection by each party were irrelevant to the proper decision of the case, nonetheless, in view of respondent's strenuous protest, the Commission went on to bring its expertise and judgment to bear upon the benefits and burdens and made findings identifying several specific benefits that would accrue to Florida Power from the interconnection. See n. 5, *supra*. Merely because the Commission argued that on its view of the legal question involved, findings of benefits were unnecessary to its decision does not render them any the less findings on the question of benefits. A reviewing court should hardly complain because an agency provides more analysis than it feels is absolutely necessary.[7]

---

[6] Respondent Florida Power concedes that the Commission's proportionate-burden analysis is appropriate when the interconnected systems are approximately equal in size and when the interconnection does benefit both parties to an interconnection. Brief for Florida Power Corp. 21.

[7] We, therefore, reject the Court of Appeals' conclusion that, because they were stated in the alternative, these were "not fact-

Section 313 (b) of the Federal Power Act, 16 U. S. C. § 825*l* (b), provides that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." See *Universal Camera Corp.* v. *NLRB,* 340 U. S. 474 (1951). Among the specific benefits the Commission found would accrue to Florida Power were increased reliability of Florida Power's service to customers in the Gainesville area, the availability of 60 to 100 mw of reserve capacity during certain periods of the year, and savings from coordinated planning to achieve use at all times of the most efficient generating equipment in both systems. The Commission's findings were aided by specific studies, made by the Commission's staff, and placed in the record. Insofar as the Court of Appeals' opinion implies that there was not substantial evidence to support a finding of *some* benefits, it is clearly wrong. And insofar as the court's opinion implies that the responsibilities assumed by Gainesville in combination with the benefits found to accrue to Florida Power were insufficient to constitute "compensation . . . reasonably due," the Court of Appeals overstepped the role of the judiciary. Congress ordained that that determination should be made, in the first instance, by the Commission, and on the record made in this case, the Court of Appeals erred in not deferring to the Commission's expert judgment.

Florida Power's emphasis on Gainesville's small size occurs only when discussing Gainesville's ability to provide Florida Power with energy. But Gainesville's small

findings protected by the umbrella of the substantial evidence test." 425 F. 2d, at 1203 n. 20. This is not a case where the Commission did not follow a procedure that it might have followed, see *SEC* v. *Chenery Corp.,* 318 U. S. 80 (1943), or failed to make findings or evaluate considerations relevant to its determination, see *Schaffer Transportation Co.* v. *United States,* 355 U. S. 83 (1957).

size has relevance in terms of the amount of power it may, even in emergencies, require from Florida Power. What Florida Power chooses to emphasize is that the availability of a certain amount of power flowing from it to Gainesville is relatively more valuable to Gainesville's small system than the availability of the same amount of power flowing from Gainesville to Florida Power. It is certainly true that the same service or commodity may be more valuable to some customers than to others, in terms of the price they are willing to pay for it. An airplane seat may bring greater profit to a passenger flying to California to close a million-dollar business deal than to one flying west for a vacation; as a consequence, the former might be willing to pay more for his seat than the latter. But focus on the willingness or ability of the purchaser to pay for a service is the concern of the monopolist, not of a governmental agency charged both with assuring the industry a fair return and with assuring the public reliable and efficient service, at a reasonable price.

Our guidepost here is the Act's explicit commitment of the judgment as to what compensation is reasonably due, in this highly technical field, to the Commission. Cf. *Permian Basin Area Rate Cases,* 390 U. S. 747, 767 (1968). In the exercise of this judgment, the Commission's order placed on Gainesville the entire $3 million cost of constructing the interconnection. Thus the benefits that the Commission found that Florida Power will receive from the interconnection will come without any capital investment on its part. In addition, the Commission required Gainesville to maintain generating capacity equal to at least 115% of its annual peak load and to maintain operating reserves in accordance with the procedures established by the Florida Operating Committee. In light of these circumstances, the Commission concluded on the basis of its proportionate-burden

analysis that Gainesville should not pay a standby charge for the availability of emergency service, which is provided only on an "as available" basis. It simply required Gainesville to pay for energy actually received. On this record, we cannot say that the Commission has failed to discharge either its responsibility to assure Florida Power of "reasonable compensation" or its responsibility to the public to assure reliable efficient electric service.

Since we conclude that substantial evidence supports the findings of the Commission that benefits will accrue to Florida Power from the interconnection, we have no occasion to decide whether the Commission in ordering the interconnection of two electric power companies, may properly condition the interconnection, when one party receives no benefits, upon compensation terms based on the relative burdens that each places on the interconnected network. Decision of that question must await a case which presents it.

*Reversed and remanded.*

MR. JUSTICE BLACKMUN took no part in the decision of these cases.