583 F.2d 399
 OTTER TAIL POWER COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Alexandria, Barnesville, Benson, Detroit Lakes, Henning,
Lake Park, Ortonville, and Warren, Minnesota, and
Big Stone City, South Dakota,
Intervenors- Respondents.
 No. 77-1582.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 17, 1978.
Decided Sept. 8, 1978.
 
 David F. Lundeen of Arvesen, Donoho, Lundeen, Hoff & Svingen, Fergus Falls, Minn., for petitioner.
 Howard E. Shapiro of Federal Energy Regulatory Commission, Washington, D. C., for respondent; Robert R. Nordhaus, Gen. Counsel, and Philip R. Telleen, Atty., Washington, D. C., on brief.
 Clinton A. Vince of Duncan, Allen & Mitchell, Washington, D. C., for intervenors-respondents; Alden Gjevre, Moorhead, Minn., Ray E. Holmquist, City Atty., Benson, Minn., James O. Ramstad, Detroit Lakes, Minn., Oscar J. Sorlie, Rufer, Hefte, Pemberton, Schulze & Sorlie, Fergus Falls, Minn., Arthur A. Drenckhahn, Myhre, Jorgenson & Drenckhahn, Warren, Minn., R. D. Schreiner, Benson & Schreiner, Ortonville, Minn., Robert R. Pflueger, City Atty., Ortonville, Minn., of counsel.
 Before VAN OOSTERHOUT, Senior Circuit Judge, and LAY and STEPHENSON, Circuit Judges.
 LAY, Circuit Judge.
 
 
 1
 This is another episode in the continuing dispute over rate schedules filed by Otter Tail Power Co., a public utility subject to the Federal Power Act,[1] and the Federal Energy Regulatory Commission.[2] The basic issue here presented is whether the Commission properly exercised its authority in the suspension of certain rate schedules for transmitting electricity proposed by Otter Tail to be charged several municipalities in Minnesota and South Dakota. We uphold the Commission's ruling.
 
 I.
 
 2
 Otter Tail Power Company sells electricity at retail to several municipalities in Minnesota, North Dakota and South Dakota. In years past, several retail customers sought to establish their own municipal electric systems upon the expiration of the retail distribution franchises awarded Otter Tail. Otter Tail's refusal to sell energy at wholesale or "wheel" transmit power to these municipalities resulted in an antitrust action in which Otter Tail was found guilty of monopolizing the retail distribution of electric power in its service area. See United States v. Otter Tail Power Co., 331 F.Supp. 54, 56 (D.Minn.1971), Aff'd in part and vacated and remanded in part, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). As a result Otter Tail was enjoined from refusing to sell electric power at wholesale and from refusing to wheel electric power over its transmission lines. 410 U.S. at 375-77, 93 S.Ct. 1022.
 
 
 3
 Prior to the culmination of the antitrust action, the Village of Elbow Lake, Minnesota, who is not a party to this case but was a former retail customer of Otter Tail, successfully established its own municipal distribution system and obtained an order from the Commission that required Otter Tail to furnish wholesale power.[3] Immediately after the Supreme Court upheld the antitrust injunction against Otter Tail, Elbow Lake contracted with the Bureau of Reclamation for wholesale power and requested Otter Tail to wheel the power to its distribution system. Accordingly, Otter Tail sought Commission approval to set a compensatory rate at five mills per kilowatt hour for this service.
 
 
 4
 The Commission ruled that the service to Elbow Lake was an initial rate for a "new type of service" under § 205 of the Federal Power Act, 16 U.S.C. § 824d (1970) and 18 C.F.R. § 35.12 (1976) of the regulations issued thereunder.[4] This decision was not appealed. The Commission then ordered a hearing to determine whether the rate was compensatory, just and reasonable. Elbow Lake asserted that the five mill rate was discriminatory because it exceeded rates charged to 17 other municipalities in Minnesota and South Dakota that had been receiving electrical power from the Bureau wheeled by Otter Tail.[5] Otter Tail countered by arguing that the one mill flat rate to the 17 towns was not compensatory and that an increased rate would soon be established for these services since the firm wheeling contracts for most of the municipalities had by their terms expired and the Bureau Otter Tail contract was due to expire on December 31, 1976. The Commission thereafter revised its hearing order to include the 17 municipalities and ordered that they be permitted to intervene as parties.[6] Ten of the municipalities took advantage of this order and the Commission granted their petition to intervene.[7]
 
 
 5
 Meanwhile, on October 4, 1976, Otter Tail attempted to adjust its rate schedule and service obligations regarding the 17 municipalities. On that date Otter Tail tendered for filing with the Commission the following documents: (1) an "Initial Rate Schedule Providing for a Compensatory Rate for Firm Wheeling (Transmission) Service, Applicable to Municipalities;"[8] (2) a notice of termination of the Bureau Otter Tail contract to be effective on December 31, 1976;[9] and (3) notices of termination of the 17 special municipal agreements to be effective on December 31, 1976.[10] Otter Tail sought to commence service under the newly filed rate schedule on January 1, 1977.[11]
 
 
 6
 Nine of the municipalities[12] affected by Otter Tail's proposed rate schedule intervened to protest the proposed rate schedule and the termination of the Bureau Otter Tail rate schedule. Eight of these cities[13] also intervened to protest the alleged attempt by Otter Tail to perpetuate the special municipal agreements past their expiration dates.[14] In addition, seven of the cities[15] filed a complaint with the Commission requesting that the termination dates of the special municipal agreements be confirmed in accordance with the terms of such agreements.
 
 
 7
 On December 28, 1976, the Commission issued one of the orders that gave rise to this appeal.[16] The Commission accepted Otter Tail's tendered filing of October 4, 1976, for a compensatory firm wheeling rate schedule.[17] However, the Commission rejected Otter Tail's petition to order the new rate effective January 1, 1977, and held that the rate application did not constitute an "initial" rate under § 206 of the Federal Power Act. The Commission found instead that the filing was a rate change subject to suspension under the Act, 16 U.S.C. § 824d(e). Pursuant thereto the Commission ordered the effective date of the rate change for wheeling suspended for five months from January 1, 1977, to June 1, 1977. The Commission also accepted and suspended for five months Otter Tail's separate notices of termination of the special municipal agreements regarding the cities that did not protest the termination.[18] The effective termination dates of the special agreements of the remaining seven cities were fixed at dates prior to December 31, 1976.[19]
 
 
 8
 Two months later the Commission granted Otter Tail's request for a rehearing of the December 28, 1976, order, but only for the limited purpose of further consideration.[20] On June 2, 1977, the Commission affirmed its earlier decision.
 
 II.
 
 9
 The major effect of the Commission's ruling is that the rate increase was delayed for five months and the increased rate charged the 17 towns[21] commencing June 1, 1977, is subject to refund in the event the Commission determines in the ongoing rate hearing that the rate is unjust or unreasonable.[22] This is in contrast to the new rate now being charged Elbow Lake.[23] In the event that rate is held to be excessive, the Commission could order a prospective rate reduction.[24] The Commission possesses no authority, however, to order a refund for the period the excess rate is charged to Elbow Lake.[25]
 
 
 10
 Otter Tail now seeks review of the Commission's latest orders as they affect the rate filed for the 17 communities. It urges that the Commission erred (1) in failing to file the rate schedule as an initial rate under § 205, (2) in failing to make Otter Tail's newly filed rate for firm wheeling service applicable to the towns effective January 1, 1977, (3) in suspending the expiration and termination of the Bureau Otter Tail contract beyond December 31, 1976, and (4) in failing to recognize the termination of the separate municipal rate schedules for each town on December 31, 1976.
 
 
 11
 Before assessing the merits of these contentions we first summarily dispose of the intervenors' and Commission's claim that the suspension of Otter Tail's rate increase is not a reviewable matter. The Commission urges that suspension or the refusal to suspend a rate change is a nonreviewable exercise of agency discretion. See City of Westfield v. FPC, 551 F.2d 468, 468 (1st Cir. 1977); Municipal Light Boards v. FPC, 146 U.S.App.D.C. 294, 304, 450 F.2d 1341, 1351 (1971), Cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972). We have no disagreement with these authorities. The Commission's discretionary suspension power, however, exists only when a utility files a rate change. Accordingly, an initial inquiry must be made to determine whether the Commission has exceeded the scope of its authority in declaring the newly filed rate a change in rate rather than an initial one. Because the Commission's characterization of the rate affects its basic authority under the Act, the Commission's decision is reviewable. Cf. Trans Alaska Pipeline Rates Cases, 436 U.S. 631, 638-39, 98 S.Ct. 2053, 2058-59, n.17, 56 L.Ed.2d 591 (1978).
 
 
 12
 The fundamental question relating to all issues on review is whether the Commission appropriately characterized the Otter Tail rate filing a changed rate. If the Commission erred in its determination, it of course would have no statutory power to suspend the new rate or continue the old rate.
 
 
 13
 In order to reject the Commission's rate change conclusion this court must find that the decision cannot be rationally reconciled with the terms of the Act. See Gulf Oil Corp. v. FPC, 563 F.2d 588, 606 (3d Cir. 1977), Cert. denied, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978); Distrigas of Massachusetts Corp. v. FPC, 517 F.2d 761, 765 (1st Cir. 1975); Southern California Edison Co. v. FPC, 387 F.2d 619, 621 (3d Cir. 1967), Cert. denied, 392 U.S. 909, 88 S.Ct. 2055, 20 L.Ed.2d 1367 (1968). Accordingly, an initial examination of the relevant statutory provisions is required.
 
 
 14
 The Act nowhere defines initial rates or changed rates. Instead, the distinction arises from the basic statutory scheme that defines the Commission's power and prescribes certain procedural prerequisites for the exercise of that power.
 
 
 15
 Section 206 of the Act, 16 U.S.C. § 824e, provides in part:
 
 
 16
 (a) Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be Thereafter observed and in force, and shall fix the same by order.
 
 
 17
 (Emphasis added).
 
 
 18
 Section 205(d) of the Act, 16 U.S.C. § 824d(d), requires in part:
 
 
 19
 Unless the Commission otherwise orders, no Change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect.
 
 
 20
 (Emphasis added).
 
 
 21
 Section 205(e), 16 U.S.C. § 824d(e) reads in part:
 
 
 22
 Whenever any Such new schedule (i. e. rate change schedule) is filed the Commission shall have authority . . . to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect . . ..
 
 
 23
 (Emphasis added.)
 
 
 24
 The above quoted sections of the Act make it clear that the initial rate/changed rate dichotomy is relevant only in the context of the Commission's power to ensure that utility rates are just and reasonable.[26]
 
 
 25
 Under the statutory scheme, it would appear that initial rates are, in effect, presumed just and reasonable until the Commission determines otherwise.[27] If the Commission finds the initial rate to be unlawful it can order a prospective alteration.[28] When a utility purports to modify or supersede an existing rate schedule, however, the Commission may suspend the operation of the change in order to preserve the status quo. The practical desirability of this added authority is obvious.
 
 
 26
 When a utility seeks to change the schedule the Act provides the Commission with the authority to preserve the rate for five months in order to give the Commission time to assess the new rate. This supplemental suspension power is not available when considering initial rates since there exists no service status quo to maintain.
 
 
 27
 Thus "initial rates," although the Act does not specifically use this phrase, would appear to be rates that are set in the first instance by the public utility to cover new services rendered to new customers.[29] A changed rate, on the other hand, would apparently exist any time a newly filed rate schedule purports to modify or supersede a preexisting schedule. Accordingly, under the literal terms of the Act, if a rate schedule purports to change any " rate, charge, classification, or service,"[30] it would presumably constitute a rate change that would be subject to the Commission's suspension and refund authority.[31]
 
 
 28
 There is no question that the schedule filed by Otter Tail on October 4, 1976, was intended to "supersede, supplement, cancel or otherwise change" the provisions of the rate schedules contained in the Bureau Otter Tail contract and special municipal agreements. Thus, under our reading of the Act Otter Tail's schedule would clearly constitute a rate change.
 
 
 29
 Fundamental Change in Service.
 
 
 30
 Otter Tail argues, however, that the schedule filed in this case encompasses a fundamental change in the nature of the service to an existing customer and therefore the new schedule should be characterized as an initial rate. In the prior Commission decision dealing with the wheeling rate to be charged Elbow Lake, Minnesota, the Commission stated that when a utility changes the nature of the service rendered an existing customer, an initial rate schedule filing is appropriate.[32] The Commission adhered to this view in the instant case. Since the Commission's interpretation of the Act is entitled to great weight[33] and since this court must assess the rationality of the Commission's decision on the basis of the reasoning given by the Commission, our disposal of Otter Tail's contention requires further treatment.
 
 
 31
 Otter Tail's argument that its filing should be classified as an initial rate is premised on the factual assertion that the service provided under the newly filed rate is fundamentally different from the service rendered pursuant to the Bureau Otter Tail contract and special municipal agreements. For purposes of classifying the rate schedule, the Commission found no essential differences.[34]
 
 
 32
 Our review of this factual determination is expressly limited by the congressional directive that "(t)he finding of the Commission as to facts, if supported by substantial evidence, shall be conclusive." Federal Power Act § 313(b), 16 U.S.C. § 825L (b). See FPC v. Florida Power & Light Co., 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972); Gainesville Utilities Dept. v. Florida Power Corp., 402 U.S. 515, 526-29, 91 S.Ct. 1592, 29 L.Ed.2d 74 (1971). While it is true that the factual determination in this case blends with the legal issue regarding whether the rate is an initial rate, that fact does not empower this court to substitute its judgment for the administrative expertise of the Commission. Cf. E. I. du Pont de Nemours & Co. v. Collins, 432 U.S. 46, 54-57, 97 S.Ct. 2229, 53 L.Ed.2d 100 (1977); SEC v. Chenery Corp., 332 U.S. 194, 209, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).
 
 
 33
 We cannot say the Commission irrationally concluded that the new service provided was essentially the same as the old for purposes of determining whether the rate filed was an initial rate. It is true the service now provided is on a firm basis, rather than on an excess capacity commitment. Nevertheless, the type of service is the same originally provided under the Bureau Otter Tail contract, to-wit: wheeling service.[35]
 
 
 34
 Elbow Lake.
 
 
 35
 Otter Tail advances a related but more indirect attack on the Commission's decision by claiming that the Commission deviated from its prior decision in the Elbow Lake case without adequate explanation. Thus, Otter Tail contends the Commission's decision to classify the filed rate as a change in rate in the instant case was an arbitrary action outside its scope of authority. We disagree.
 
 
 36
 The essential difference between Elbow Lake and the intervenors appears to be that when Elbow Lake contracted for wheeling service it was receiving wholesale electric service from Otter Tail. This was power provided, generated and transmitted by Otter Tail to Elbow Lake with no involvement of the Bureau. Under the schedule found to be an initial rate Elbow Lake is now paying Otter Tail only for wheeling electricity purchased from the Bureau. The intervenors, on the other hand, were receiving excess capacity wheeling service and are now receiving firm wheeling service.
 
 
 37
 While we acknowledge the Commission cannot arbitrarily or discriminatorily change its policy,[36] the Commission's action in the instant case does not present such a situation. The explicit terms of the Commission's order refines the distinction between initial and changed rates that was drawn in the Elbow Lake case. Although the dividing line between initial and changed rates that emerged from these two orders might have been more sharply defined, it is for the Commission to draw the line based on its technical expertise. We find the line drawn to be a rational one.[37]
 
 III.
 
 38
 In upholding the Commission's changed-rate conclusion, we are likewise compelled to uphold the Commission's decision to suspend the operation of the new schedule and the termination of the old rate. Section 205 of the Act, 16 U.S.C. § 824d(e), clearly gives the Commission unreviewable discretion to suspend rate changes.[38] See City of Westfield v. FPC, 551 F.2d 468, 468-69 (1st Cir. 1977); Municipal Light Boards v. FPC, 146 U.S.App.D.C. 294, 304, 450 F.2d 1341, 1351 (1971), Cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972). And § 2.4(f) of the relevant regulations states that "(d) uring suspension, the prior existing rate schedule continues in effect and should not be changed during suspension." 18 C.F.R. § 2.4(f). Cf. Sunray Mid-Continent Oil Co. v. FPC, 364 U.S. 137, 153-56, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960).
 
 IV.
 
 39
 We now turn to the final objection raised by Otter Tail. It is asserted that the supplementary agreements of the 17 towns providing firm service with Otter Tail affected the overall rate charged. It is urged that the Commission should have not ordered the continuance of the basic rate under the Bureau contract (1 mill) without a similar continuance of the expired special agreements for firm service of 1.5 mills. The Commission views the special agreements separate from the basic transmission services provided the towns under the Bureau Otter Tail contract. To the extent that Otter Tail urges that these agreements are interlocking with the Bureau contract, this argument was rejected in a previous decision of this court. See Otter Tail Power Co. v. FPC, 536 F.2d 240, 242 n.2 (8th Cir. 1976).
 
 
 40
 Otter Tail urges here, however, that its argument is not the same as the one previously rejected. It claims "that a municipal rate schedule, to provide the other essential elements for wheeling of Bureau power, is a necessary part of receiving wheeling service, including the provision for payment of 1.5 mills/kWh to Otter Tail, and the cities cannot have or get wheeling of Bureau power from Otter Tail without it." We find the proffered distinction unpersuasive. In our earlier decision we stated as follows:
 
 
 41
 Otter Tail additionally asserts that its separate contracts with the towns, which have now expired with respect to Alexandria and Tyler, control in terms of its obligation to transmit power under the USBR Otter Tail contract. We are in accord with the FPC's determination that the Otter Tail municipal contracts were not interlocked in a manner that would terminate Otter Tail's responsibility to provide transmission power to the towns through December 31, 1976.
 
 
 42
 Otter Tail Power Co. v. FPC, 536 F.2d at 242 n.2.
 
 
 43
 As previously discussed, one effect of the Commission's order was that seven of the special municipal agreements expired prior to December 31, 1976, and the remainder expired on May 31, 1977. Thus, prior to the effective date of the new rate schedule seven of the cities received firm transmission service for 1 mill/kWh while the balance had to pay 2.5 mills/kWh. Otter Tail asserts that this disparity constitutes an abuse of the Commission's discretion and shows that the 1 mill/kWh rate is unreasonably low. Again we must disagree.
 
 
 44
 The alleged disparity results not from the Commission's action, but rather from the varying termination dates contained in the municipal agreements which Otter Tail voluntarily entered into. In an analogous situation the Supreme Court stated:
 
 
 45
 (W)hile it may be that the Commission may not normally Impose upon a public utility a rate which would produce less than a fair return, it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain. Cf. Arkansas Natural Gas Co. v. Railroad Comm'n, 261 U.S. 379, (43 S.Ct. 387, 67 L.Ed. 705.) In such circumstances the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory. That the purpose of the power given the Commission by § 206(a) is the protection of the public interest, as distinguished from the private interests of the utilities, is evidenced by the recital in § 201 of the Act that the scheme of regulation imposed "is necessary in the public interest." When § 206(a) is read in the light of this purpose, it is clear that a contract may not be said to be either "unjust" or "unreasonable" simply because it is unprofitable to the public utility.
 
 
 46
 In conclusion, we agree with Otter Tail that the new rate schedule under the statute must be compensatory. However, this issue is not before us; we can only assume at this writing that the hearings have been or will be soon conducted and the Commission will make its determination as to a just and reasonable rate affecting all of the municipalities to be served by Otter Tail.
 
 
 47
 We fail to find error in the Commission's treatment of the rates as not being initial rates and in holding that they constitute a change in rates under the statutes and regulations.
 
 
 48
 The Commission's orders under review are affirmed.
 
 
 
 [1]
 16 U.S.C. §§ 824(b), (e)
 
 
 [2]
 Effective October 1, 1977, the Federal Power Commission became the Federal Energy Regulatory Commission (FERC), an independent regulatory agency within the Department of Energy, Sections 401, 402, 406, Department of Energy Organization Act, Pub.L. No. 95-91, 91 Stat. 565, 42 U.S.C. §§ 7171, 7172, 7176
 
 
 [3]
 See Village of Elbow Lake, Minn. v. Otter Tail Power Co., 40 F.P.C. 1262 (1968), Aff'd sub nom. Otter Tail Power Co. v. FPC, 429 F.2d 232 (8th Cir. 1970), Cert. denied, 401 U.S. 947, 91 S.Ct. 923, 28 L.Ed.2d 230 (1971); Village of Elbow Lake, Minn. v. Otter Tail Power Co., 46 F.P.C. 675 (1971), Modified, 473 F.2d 1253 (8th Cir. 1973)
 
 
 [4]
 Otter Tail Power Co., 50 F.P.C. 1341, 1343 (1973)
 
 
 [5]
 The rate for the 17 municipalities was originally fixed in 1955 by a contract between Otter Tail and the Bureau of Reclamation. Pursuant to this contract, Otter Tail agreed to wheel power from the Bureau's Missouri River dams to the 17 municipal power systems for a service charge of 1 mill per kilowatt hour. The contract called for only "excess capacity" wheeling; that is, Otter Tail was required to wheel power only to the extent that it had transmission line capacity in excess of that needed to supply its own retail customers
 In addition, several of the municipalities entered into separate agreements with Otter Tail for "firming transmission service" at an additional charge of 1.5 mills per kilowatt hour. Under these agreements Otter Tail was bound to provide electricity in the event its excess capacity was insufficient to meet the power needs of the municipalities.
 
 
 [6]
 Otter Tail Power Co., (order expanding hearing), 52 F.P.C. 1007, 1008-09 (1974)
 
 
 [7]
 Otter Tail Power Co., (order denying rehearing), 52 F.P.C. 1572, 1574 (1974). Thereafter Elbow Lake and the intervenors objected to the expanded hearing, but the Commission affirmed its original order. Elbow Lake and the 10 towns sought review in the Court of Appeals for the District of Columbia. The Commission's discretion in ordering the expanded hearing was upheld; the court affirmed the Commission's ruling not to separate from the hearing Elbow Lake's contention of discriminatory treatment. Towns of Alexandria, Minn. v. FPC, 181 U.S.App.D.C. 83, 95-96, 555 F.2d 1020, 1032-33 (1977)
 
 
 [8]
 Otter Tail was advised on October 28, 1976, that its submittal did not contain all information necessary. This deficiency was corrected by Otter Tail on November 15, 1976, and the Commission ordered that the later date constituted the official filing date. Otter Tail Power Co., (order accepting and suspending filings, FPC Nos. ER77-5, ER77-6, ER77-7 and E-9544) (Dec. 28, 1976)
 
 
 [9]
 This contract terminated according to its own terms on December 31, 1976
 
 
 [10]
 The special municipal agreements provided for varying expiration dates, none of which fell on December 31, 1976
 Special Municipal
 Electric Service Agreement Provisions
 Expiration
 Municipal Term Date
------------------------- ------------ ----------
 1. Alexandria, MN 10 years 10-20-72
 2. Badger, S. D. 10 years 1- 1-76
 3. Barnesville, MN 10 years 12- 1-75
 4. Benson, MN 10 years 12- 1-75
 5. Big Stone City, S. D. 10 years 1- 1-76
 6. Breckenridge, MN 10 years 12-20-79
 7. Detroit Lakes, MN 10 years 12- 1-75
 8. Estelline, S. D. 10 years 1- 1-76
 9. Henning, MN 10 years 12- 1-75
10. Lake Park, MN 10 years 12- 1-75
11. Newfolden, MN 10 years 12-20-79
12. Nielsville, MN 10 years 12- 1-75
13. Ortonville, MN 10 years 12- 1-75
14. Shelly, MN 10 years 12-21-80
15. Stephen, MN 10 years 12- 1-75
16. Tyler, MN Service
 discontinued
 6/23/76
17. Warren, MN 10 years 12- 1-75
 See Otter Tail Power Co., (order accepting and suspending filings, Attachment A, FPC Nos. ER77-5, ER77-6, ER77-7 and E-9544) (Dec. 28, 1976).
 
 
 [11]
 In a prior case it was determined that an earlier effort to file a compensatory rate for firm wheeling service to the municipalities was premature, and that the Bureau Otter Tail contract executed on June 14, 1955, expressly required Otter Tail to furnish transmission service to the municipalities at a fixed rate until December 31, 1976. Otter Tail Power Co., (orders rejecting filings, FPC Nos. E-9240 and E-9507) (1975), Aff'd sub nom. Otter Tail Power Co. v. FPC, 536 F.2d 240, 242 (8th Cir. 1976)
 
 
 [12]
 Cities of Alexandria, Barnesville, Benson, Detroit Lakes, Henning, Lake Park, Ortonville and Warren, Minnesota, and Big Stone City, South Dakota
 
 
 [13]
 Cities of Alexandria, Barnesville, Benson, Detroit Lakes, Henning, Lake Park, Ortonville and Warren, Minnesota
 
 
 [14]
 All of the special agreements between Otter Tail and the eight intervenors were to expire by their terms prior to December 31, 1976. See table contained in note 10, Supra
 
 
 [15]
 Cities of Alexandria, Barnesville, Benson, Detroit Lakes, Henning, Tyler and Warren, Minnesota
 
 
 [16]
 Otter Tail Power Co., (order accepting for filing and suspending certain proposed rate schedule filings, establishing procedures, consolidating proceedings and granting interventions, FPC Nos. ER77-5, ER77-6, ER77-7 and E-9544) (Dec. 28, 1976)
 
 
 [17]
 Otter Tail's filed rate is slightly lower than the five mills being charged to Elbow Lake. The rate filed in this proceeding for the 17 municipalities was the same $21.05/kW/ year rate as filed for Elbow Lake; the Commission calculated that for the municipalities considered as a group, the rate was equivalent to approximately 4.2 mills/kWh
 
 
 [18]
 Thus, May 31, 1977, was fixed as the termination date of the special agreements with the cities of Badger, Big Stone City, and Estelline, South Dakota, and Breckenridge, Lake Park, Newfolden, Nielsville, Ortonville, Shelly and Stephen, Minnesota
 
 
 [19]
 The effect of the Commission's order was that during the interim between December 31, 1976, and June 1, 1977, some of the towns paid 1 mill/kWh while other towns paid 2.5 mills/kWh
 
 
 [20]
 Otter Tail Power Co., (order granting rehearing for further consideration, FPC Nos. ER77-5, ER77-6, ER77-7 and E-9544) (Feb. 25, 1977)
 
 
 [21]
 The record indicates that only 15 towns will actually be affected by the new rate. Two of the 17 towns, Tyler, Minnesota and Estelline, South Dakota, apparently have no further need to receive service from Otter Tail since they are receiving transmission service from other sources
 
 
 [22]
 Federal Power Act § 205, 16 U.S.C. § 824d(e)
 
 
 [23]
 We note, however, that Elbow Lake's claim of discrimination is still a viable issue before the Commission in the rate hearing. See Towns of Alexandria, Minn. v. FPC, 181 U.S.App.D.C. 83, 94, 555 F.2d 1020, 1031 (1977)
 
 
 [24]
 Federal Power Act § 206, 16 U.S.C. § 824e
 
 
 [25]
 See United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 341, 76 S.Ct. 373, 100 L.Ed. 373 (1956); FPC v. Sierra Pac. Power Co., 350 U.S. 348, 353, 76 S.Ct. 368, 100 L.Ed. 388 (1956)
 
 
 [26]
 In construing the "virtually identical provisions" of the Natural Gas Act, the Supreme Court stated:
 The basic power of the Commission is . . . to set aside and modify any rate or contract which it determines, after hearing, to be "unjust, unreasonable, unduly discriminatory, or preferential." This is neither a "rate-making" nor a "rate-changing" procedure. It is simply the power to review rates and contracts made in the first instance by . . . companies and, if they are determined to be unlawful, to remedy them. (This power would) apply to All the rates of a natural gas company, whether long-established or newly changed, but in the latter case the power is further implemented . . . . (A)dd(ed) to this basic power, in the case of a newly changed rate or contract . . . (are) the further powers (1) to preserve the status quo pending review of the new rate by suspending its operation for a limited period, and (2) thereafter to make its order retroactive, by means of the refund procedure, to the date the change became effective. The scope and purpose of the Commission's review remain the same to determine whether the rate fixed by the . . . company is lawful.
 United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 341, 76 S.Ct. 373, 379, 100 L.Ed. 373 (1956).
 See FPC v. Sierra Pac. Power Co., 350 U.S. 348, 353, 76 S.Ct. 368, 100 L.Ed. 388 (1956).
 
 
 [27]
 In making this observation, we do not mean to imply that merely because a rate schedule is in effect that an evidentiary presumption of reasonableness attaches. Indeed, 18 C.F.R. § 35.4 specifically states that "(t)he fact that the Commission permits a rate schedule or any part thereof or any notice of cancellation to become effective shall not constitute approval by the Commission of such rate schedule or part thereof or notice of cancellation."
 
 
 [28]
 Federal Power Act § 206, 16 U.S.C. § 824e(a). See FPC v. Sierra Pac. Power Co., 350 U.S. at 353, 76 S.Ct. 368
 
 
 [29]
 See City of Cleveland, Ohio v. FPC, 174 U.S.App.D.C. 1, 11, 525 F.2d 845, 855 (1976)
 
 
 [30]
 Federal Power Act § 205, 16 U.S.C. § 824d(d)
 
 
 [31]
 This view is supported by the Commission's regulations. 18 C.F.R. § 35.1(c) reads in pertinent part:
 A rate schedule applicable to a transmission or sale of electric energy which proposes to Supersede, supplement, cancel or otherwise change any of the provisions of a rate schedule required to be on file with this Commission (such as providing for other or additional rates, charges, classifications or services, or rules, regulations, practices or contracts for a particular customer or customers) shall be filed as a change in rate. . . .
 (Emphasis added).
 
 
 [32]
 Otter Tail Power Co., (order accepting filing), 50 F.P.C. 1341, 1342-43 (1973). Elbow Lake did not seek review of the Commission's initial-rate classification and the propriety of that decision is not before us
 
 
 [33]
 In enacting the Federal Power Act, Congress charged the Federal Energy Regulatory Commission, not the courts of appeals, with the task of devising methods of enforcing the policy of the Act. Cf. Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944)
 
 
 [34]
 In assessing Otter Tail's "fundamental change" argument, the Commission, in its order upon reconsideration, observed:
 We find that the distinctions made by Otter Tail between the service provided under the Bureau Otter Tail Contract and the proposed rate schedule do not warrant treating Otter Tail's filing as an initial rate schedule. Otter Tail points to the fact that the service rendered under the Bureau Otter Tail Contract is rendered to the Bureau and not the municipalities. In this instance, the Commission will not allow form to triumph over substance. Though Otter Tail's Contract was technically with the Bureau, the municipalities were third-party beneficiaries of that Agreement. Otter Tail wheels power for the Bureau and is compensated by the Bureau for wheeling service. However, the cost of wheeling is recovered by the Bureau in the rates for power charged to the municipalities. Otter Tail's proposed schedule increases the costs of wheeling which will ultimately be borne by the municipalities.
 For the purpose of deciding whether or not to treat Otter Tail's filing as an initial rate or a change in rate schedules, it makes little sense to distinguish excess capacity transmission service from firm transmission service; The basic service being rendered in both instances is transmission service. Nor is the fact that the new transmission rate is filed in tariff form as opposed to a negotiated contract grounds for treating Otter Tail's filing as an initial rate schedule.
 Otter Tail Power Co., (order denying in part and granting in part rehearing, FPC Nos. ER77-5, ER77-6, ER77-7, E-9544 and E-8152) (June 2, 1977), appendix at 355-56 (emphasis added).
 
 
 [35]
 Whether there exists a practical difference between "excess capacity" service and "firm" transmission service provided the cities is disputed by the parties. The Commission found that there existed no essential difference since in both instances Otter Tail was wheeling electrical power. For us to say otherwise at least on the present record would require our substitution of judgment in a technical field. The commitment to furnish excess power was dependent on the contract terms. The record indicates that there was no interruption of such service to any of the communities since 1955 based upon Otter Tail's inability to service them
 
 
 [36]
 See Distrigas of Massachusetts Corp. v. FPC, 517 F.2d 761, 765-66 (1st Cir. 1975); Public Serv. Comm'n v. FPC, 167 U.S.App.D.C. 100, 114-117, 511 F.2d 338, 352-55 (1975); Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (1970), Cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); NLRB v. Tallahassee Coca-Cola Bottling Co., 381 F.2d 863, 869 (5th Cir. 1967)
 
 
 [37]
 If the Commission finds the line drawn impractical it is free to change it in the future. See NLRB v. Bell Aerospace Co., 416 U.S. 267, 294-95, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); NLRB v. Wentworth Inst., 515 F.2d 550, 554-55 (1st Cir. 1975); K. Davis, Administrative Law Treatise §§ 17.07-.08 (Administrative Law of the Seventies Supp.1976). The role of the courts is not to rigidify or freeze the administrative process, but rather to ensure that it proceeds on a reasoned basis that is not clearly outside the statutory framework. Cf. SEC v. Chenery Corp., 332 U.S. 194, 201-03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)
 
 
 [38]
 Otter Tail argues that even if the Commission had the power to suspend the new schedule, the suspension should be set aside because the Commission did not provide a sufficient "statement in writing of its reasons for such suspension" as required by the Act. Federal Power Act § 205, 16 U.S.C. § 824d(e). The Commission's order states that the rate increase ranges from 183% To 332% For individual customers. The order also recounts allegations by several of the affected municipalities that the new rates fail to reflect Otter Tail's actual costs and are therefore excessive. The Commission concluded that it should suspend the rate increases since Otter Tail had not shown them to be "just and reasonable," and because they "may be unjust, unreasonable, unduly discriminatory, preferential or otherwise unlawful."
 While the Commission's conclusion is couched in rather conclusory terms, it is difficult to require a detailed statement of reasons for a suspension when the primary purpose of the suspension is to allow the Commission to determine the validity of the proposed rates. See 16 U.S.C. § 824d(e). In light of the "overriding intent of the Congress to give full protective coverage to the consumer," Atlantic Refining Co. v. Public Serv. Comm'n, 360 U.S. 378, 389, 79 S.Ct. 1246, 1254, 3 L.Ed.2d 1312 (1959) (construing suspension provisions of the Natural Gas Act), we find the statement in the December 28, 1976, order adequate.
 C v. Sierra Pacific Power Co., 350 U.S. 348, 355, 76 S.Ct. 368, 372, 100 L.Ed. 388 (1956).